**Lester Sola, Plaintiff-Appellant, v. City of Chicago, a Municipal Corporation, Defendant-Appellee.**

**Gen. No. 50,637.**

First District, Third Division.

March 9, 1967.

Rehearing denied June 8, 1967.

George C. Rabens, of Chicago, for appellant.

Raymond F. Simon, Corporation Counsel, of Chicago (Sydney R. Drebin, Assistant Corporation Counsel, and Harry H. Pollack, Special Assistant Corporation Counsel, of counsel), for appellee.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal by plaintiff from a judgment in favor of defendant in a common-law action for personal injuries based upon negligence and under the Structural Work Act of Illinois (commonly called the Scaffold Act). (Ill Rev Stats 1963, c 48, par 60 et seq.)

The plaintiff, Lester Sola, was in the employ of Fitzsimons & Connell Dredge & Dock Company on June 17, 1957. At the time he was twenty-five years of age and in good physical condition. He was employed as a member of a pile driving crew which was then engaged on a job at the City of Chicago filtration plant under construction just east of the Outer Drive and north of Grand Avenue and Navy Pier in Chicago.

Relevant parts of the contract between the City and the contractor, as read in evidence, included the following:

" 'Definition of Terms.' Engineer means Commissioner of Public Works of the City of Chicago, or Chief Engineer of the Bureau of Engineering of the Department of Public Works of the City of Chicago, or any other person designated by either of them to be the Engineer in charge of all or any part of the work.

"Precautions and Safety. The Contractor shall take any precautions that may be necessary to render all portions of the work secure in every respect or to decrease the liability of accidents from any cause, or to avoid contingencies which are liable to delay the completion of the work. The Contractor shall furnish and install, facilities to provide safe means of access to all points where work is being performed and make all necessary provisions to insure the safety of workmen and of engineers and inspectors during the performance of said work.

"Precautions shall be exercised at all times for the protection of persons (including employees) and property. The safety provisions of applicable laws, building and constructions codes shall be observed.

. . . . . .

"The Contractor shall employ and assign to work on this contract only, a qualified technical engineer satisfactory to the Chief Engineer, to act as contact man with the Engineer and to set and maintain the lines and grades necessary for the proper performance of the work under this contract.

. . . . . .

"As the work progresses, changes or modifications in such procedure and construction schedule,

or in such methods, structures and equipment may be required by the Engineer.

"The Engineer may disapprove and reject or require modification of any proposed or previously approved order of procedure, method, structure, or equipment, which he considers to be unsafe for the work hereunder, or for other work being carried on in the vicinity, etc."

The mechanical equipment used in the pile driving operation consisted of a crane, a boiler for steam, a steam driven hammer, and a bulldozer to move the piles to the crane. The crane lifted the piles into position where they were to be driven. Attached to the crane was the pile driver. Basically, the piles were put into leads which were the tracks which the piles were to follow. The pile driving hammer consisted of a head and a ram. The ram exerted steam driven pressure on the head which then struck the pile to drive it down. Upon completion of this phase of the operation, the head was steam driven up to meet the ram and thus again be in the driving position. All of this equipment was controlled by a crane operator seated in the cab of the crane. It was his job to perform the actual driving operation. This man was a Fitzsimons' employee and under the general supervision of a Fitzsimons' foreman.

The city of Chicago, the owner of the construction site, had an engineer on the job who was to see that the piles were driven in accordance with plans and specifications, and that they were properly driven and installed so as to adequately perform their functions. The engineer determined the bearing capacity of the piling by counting the number of times the hammer struck for each foot the pile was driven into the ground. Chalk marks that he placed on the leads allowed him to determine the number of strikes per foot.

On June 17, 1957, while the crane operator was away from his cab, Morgan, the City engineer, began to mark the leads on which prior marks had been obliterated. After placing markings as high as he was able, he asked Sola to reach up and make the higher markings, because the latter was a taller man. Marking the leads was not a part of Sola's regular job.

After he had placed the markings as high as he could reach, he put his foot between the hammerhead and the ram so as to reach another three feet. Sola testified that he told Morgan he did not want to do it because the hammer might fall, and that Morgan told him (Sola) to go ahead. Morgan testified that he did not tell Sola to get on the hammer, and that he did not recall whether Sola told of his fear of the hammer falling. While Sola had his foot on top of the hammer head, the cab man returned to the cab and set the machinery in motion; the hammer went up; the ram came down to meet it; and Sola's foot was jammed between the two parts.

Sola and Morgan both testified that they were on the left side of the leads during the marking, that the cab operator sat on the right side of the cab and therefore would not be able to see them, that the operator's vision of them would be obstructed by the pile driving equipment, and that Morgan could not and did not see the cab operator when he returned to the cab. Morgan testified that there were no safety aspects to his job as engineer. Testimony showed that the system of signals for operation of the crane involved only manual signals by the foreman and the cab man.

As a result of the accident Sola suffered the loss of several toes and the crippling of his right foot. After convalescence he returned to work with the same company, but was engaged in lighter work. A few weeks thereafter he was permanently separated from Fitzsimons.

Plaintiff brought suit against the City claiming rights under common-law negligence and under the Scaffold Act. The court labelled the allegations under the Scaffold Act (plaintiff's amended complaint) as Count II and granted a motion by defendant, at the close of all the evidence, to strike said count on the ground that it was inconsistent with the facts of the case. The common law negligence count went to the jury, which returned a verdict in favor of defendant.

Plaintiff contends on appeal that the order striking his "Count II" was erroneous in that the Scaffold Act is applicable to the case; that the court improperly instructed the jury on the allegations under common law negligence; and that the court made prejudicial and inflammatory remarks in the presence of the jury during plaintiff's counsel's final argument.

Plaintiff first urges that the Scaffold Act does apply to this case and the complaint, insofar as it related to the Act, should not have been stricken. The sections of the Act as would pertain to this case are sections 7a and 9. They read in part as follows:

> "If elevating machines or hoisting apparatus, operated or controlled by other than hand power, are used in the construction . . . of any building or other structure, a complete and adequate system of communication by means of signals shall be provided and maintained by the owner, contractor or subcontractor, during the use and operation of such elevating machines or hoisting apparatus, in order that prompt and effective communication may be had at all times between the operator of engine or motor power of such elevating machine and hoisting apparatus, and the employees or persons engaged thereon, or in using or operating the same.
>
> . . . . . .

"Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, . . . of any building . . . within the provisions of this act, shall comply with all the terms thereof, . . . .

. . . . . .

"For any injury to person or property occasioned by any wilful violations of this act or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby. . . ."

It is contended that the machinery involved was within the scope of the Act, and that whether the City was in charge of the work so as to be liable under the Act was at least a question of fact for the jury. Defendant agrees that the apparatus involved is within the purview of the Act, but argues that the order was proper because the City was in no way in charge of the work.

Defendant cites several cases which hold that mere ownership is insufficient to establish liability under the Act. Valley v. United States, 230 F Supp 674; Campione v. Henry C. Lytton & Co., 57 Ill App2d 147, 206 NE2d 780; Melvin v. Thompson, 39 Ill App2d 413, 188 NE2d 497. In these cases the owner exercised no supervision of the progress of the job, on the work site, whereas in the instant case the City had an engineer on the job at all times who worked closely with the contractor's men involved in the pile driving operation. The question of whether one is in charge of an operation arises with some frequency and the Supreme Court has discussed it at great length. Gannon v. Chicago, M., St. P. & P. Ry. Co., 22 Ill2d 305, 175 NE2d 785, involved some inspection of work at the construction site by the owner, although the work directly involved in the accident was performed by the plaintiff's employer. The court said at page 323:

272

"Under the circumstances, it was at most a disputed question of fact whether the owner could be deemed to be in charge of the construction within the meaning of the act, and it would be the province of the jury, under proper instructions, to make that determination."

In Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247, a workman was injured when he fell from a scaffold erected by his employer on a job site at defendant's plant. The court indicated that "having charge of" could be inferred from various factors and was a matter of factual determination in each case. The court in that case said at page 321:

"The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. . . . Thus while the actual exercise of supervision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either a sine qua non for liability under the statute."

In a very recent case, Kobus v. Formfit Co., 35 Ill2d 533, 221 NE2d 633, the trial court granted a summary judgment for defendant owner of the premises. In that case, the contractor on the job had erected the scaffold. The owner acted as his own general contractor. The court ruled on page 538 that it was error to grant a summary judgment where the "case clearly disclosed a question of fact as to whether defendant, under the facts present, was 'in charge of' the construction within the meaning of the Scaffold Act."

■■ In this case the contract for construction gave defendant the right to approve all safety facilities and the right to require changes or modifications in schedul-

ing, methods, structures, and equipment used (these may be changed for safety purposes). Defendant had an engineer on the job at all times who worked closely with the contractor's crew, and who could alter the procedures by communicating with the crew foreman, although the engineer could not direct the workers himself. In light of the foregoing cases, these circumstances are sufficient to require a jury determination of whether defendant was in charge of the work involved in the accident. The City contends that the accident occurred in the operation of the crane, run by a contractor's employee at the direction of the crew foreman. In light of a recent Supreme Court decision, Miller v. DeWitt, 37 Ill2d 273, 226 NE2d 630, decided January 19, 1967, that fact would not necessarily rule out defendant's liability. In the Miller case an architect was held liable under the Scaffold Act although the contractor's men were injured in the course of their work directly under the contractor's supervision. By contract the architect had retained the right of general supervision and direction of the work, but he was not to specify the methods to be used in the first instance. However, he had the right to stop the work when necessary to insure proper execution of a contract calling for the provision of adequate safety measures.

We therefore feel that whether the City in the instant case can be said to have been "in charge of" the work should have been decided by the jury.

■ Plaintiff next contends that the court, as to the common-law negligence count, should not have given defendant's instruction number nine, which dealt with inferences to be drawn from the failure to produce a witness. We are unable to find an instruction by that number pertaining to the foregoing. In examining defendant's instruction number six, however, we find it to have properly set out the conditions precedent to the drawing of a conclusion, adverse to a party, for his failure to produce a missing witness. In this instance plaintiff says

that it was the foreman and crane operator who were not called. Plaintiff also claims (and argued this in his closing argument), that these witnesses were equally available to both parties. It is therefore difficult to see how the instruction could have been more detrimental to one party than to the other, if, in fact, it could have harmed either. This was not error on the part of the trial court.

■ Plaintiff also complains of defendant's instructions numbers nine and thirteen, which dealt with contributory negligence. A search of the record shows the only instructions which mention contributory negligence are plaintiff's instructions numbers nine and sixteen. In People v. Riley, 31 Ill2d 490, 202 NE2d 531, the court said at page 496: "It is axiomatic that an accused cannot complain of error acquiesced in or invited by him, and to this end we have held that a defendant may not complain of defects in instructions which were given at his request." This rule is equally valid in a civil case. We therefore shall not discuss these instructions.

■ Plaintiff further contends that the court erred in refusing his instruction on prior inconsistent testimony of a witness. It is claimed that the trial testimony of Morgan, the City engineer, was inconsistent with his pretrial deposition testimony. The earlier deposition was not introduced into evidence and we find no proof in the record of any inconsistency. Therefore, there was no necessity for the instruction tendered by plaintiff.

■ Lastly, plaintiff contends that the court made prejudicial, inflammatory and incurable remarks in the presence of the jury regarding "assurance," by Morgan to plaintiff, of safety while marking the leads. When plaintiff's counsel, during the final argument to the jury, said that plaintiff had been given full assurance of safety, the court interrupted to say that the word "assurance" had not been used and was therefore not proper for the argument. The court said it remembered that

plaintiff had been persuaded, but not assured. The court also offered counsel the opportunity to show where in the record the word "assurance" appeared. Counsel replied, "I will be content with that your Honor." Plaintiff was at the time offered the opportunity to prove his point but instead accepted the court's distinction of language. He cannot now complain of that decision. The remarks of the court only asked for clarification and could not be described as prejudicial and inflammatory.

For the reasons expressed above the judgment on the common-law negligence action is affirmed, and the order at the close of the evidence dismissing the Scaffold Act theory of plaintiff as set forth in the amended complaint is reversed, and the cause is remanded for a new trial only on the Scaffold Act theory.

Affirmed in part and reversed and remanded in part.

SCHWARTZ and DEMPSEY, JJ., concur.